# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### SEATTLE DIVISION

| | |
|---|---|
| **JOHN PHAM, DIANA LAZARTE, MARCO CUEVAS, VALDAMITRA ANDERSON, MICHAEL POOLE, and DANIEL FLOWERS,** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**REALPAGE, INC.;**<br>**AVENUE5 RESIDENTIAL, LLC;**<br>**BH MANAGEMENT SERVICES, LLC;**<br>**CUSHMAN & WAKEFIELD, INC.;**<br>**EQUITY RESIDENTIAL;**<br>**FPI MANAGEMENT, INC.;**<br>**GREYSTAR REAL ESTATE PARTNERS, LLC;**<br>**LINCOLN PROPERTY CO.;**<br>**MID-AMERICA APARTMENT COMMUNITIES, INC.;**<br>**SECURITY PROPERTIES INC.;**<br>**THRIVE COMMUNITIES MANAGEMENT, LLC;** and<br>**UDR, INC.**<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT
(Case Number            )

Cotchett, Pitre & McCarthy LLP
999 N. Northlake Way, Suite 215
Seattle, WA  98103

Case 3:23-cv-00337    Document 1    Filed 12/09/22    Page 1 of 39 PageID #: 1

# TABLE OF CONTENTS

Page

I. INTRODUCTION...................................................................................1

II. NATURE OF THE ACTION....................................................................1

III. JURISDICTION.....................................................................................5

IV. VENUE..................................................................................................6

V. PARTIES...............................................................................................7

VI. DEFENDANTS' AGENTS....................................................................11

VII. FACTUAL BACKGROUND.................................................................12

    A. The Market for Multifamily Residential Property Leases.....................12

    B. Historical Pricing in the Market for Multifamily Residential Property Leases.....14

    C. The Landlord Defendants' Outsource Price and Supply Decisions to a Common Decision Maker—RealPage—and Used RealPage Software to Eliminate Competition.....................14

        1. Mutually Accepted Price Matrix...................................................15

        2. Price-Fixing Mechanism...............................................................16

        3. RealPage Disciplines Landlords on Pricing..................................18

    D. The Landlord Defendants and RealPage Created Anticompetitive Rental Pricing and Reduced Occupancy.....................20

    E. "Plus Factors" Render the Market for Multifamily Residential Property Leases Susceptible to the Formation, Maintenance, and Efficacy of a Cartel.....................21

        1. High Barriers to Entry....................................................................22

        2. High Barriers to Exit......................................................................22

        3. Inelastic Consumer Demand...........................................................22

        4. Market Concentration.....................................................................23

        5. Exchanges of Competitively Sensitive Information Among Horizontal Competitors.....................23

        6. Numerous Opportunities to Collude at Trade Associations And RealPage Functions.....................24

VIII. CALL FOR FTC INVESTIGATION......................................................25

CLASS ACTION COMPLAINT
(Case Number          )

i

Cotchett, Pitre & McCarthy LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

Case 3:23-cv-00337    Document 1    Filed 12/09/22    Page 2 of 39    PageID #: 2

IX.     CLASS ACTION ALLEGATIONS ...................................................................**26**

    FIRST CAUSE OF ACTION
    Against All Defendants
    Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)...............................28

    SECOND CAUSE OF ACTION
    Against All Defendants
    (Violation Of The Washington Consumer Protection Act, ..................................30
    RCW Section 19.86.010 et seq.) .....................................................................30

    THIRD CAUSE OF ACTION
    Against All Defendants
    Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, et seq.) ....................31

    FOURTH CAUSE OF ACTION
    Against All Defendants
    Violation of the Florida Deceptive and Unfair Trade Practices Act
    (Fla. Stat. §§ 501.201 et seq.)..........................................................................32

X.      PRAYER FOR RELIEF ...........................................................................**33**

XI.     JURY DEMAND .....................................................................................**34**

# I. INTRODUCTION

This is an antitrust class action alleging that certain major residential landlords illegally exchanged and agreed on prices through a data analytics software program rather than compete to attract renters.

Plaintiffs **John Pham**, **Diana Lazarte, Marco Cuevas**, **Valdamitra Anderson**, **Michael Poole and Daniel Flowers** challenge Defendants **RealPage, Inc.** and certain lessors of multifamily residential property leases, including **(1) Avenue5 Residential, LLC, (2) BH Management Services, LLC, (3) Cushman & Wakefield, Inc., (4) Equity Residential, (5) FPI Management, Inc., (6) Greystar Real Estate Partners, LLC, (7) Lincoln Property Co., (8) Mid-America Apartment Communities, Inc., (9) Security Properties, Inc., (10) Thrive Communities Management, LLC,** and **(11) UDR, Inc.** (together, "Landlords" or "Landlord Defendants" and collectively with Real Page, Inc., "Defendants") for engaging in a conspiracy to artificially raise the rental prices of multifamily residential property leases in the United States to supra-competitive levels.

# II. NATURE OF THE ACTION

1.     Prior to participating in the conspiracy alleged herein, on information and belief, sometime prior to 2016, the above-referenced Landlords assessed and priced multifamily residential property leases per their own assessments of the market. This was done in a manner that maximized occupancy, with an added incentive to maintain healthy competition among Landlords by luring renters with competitive pricing. Prior to the collusive conduct, decisions to put leases on the market were independently taken, resulting in the natural play of competitive market forces.

2.     *In or around 2016, Landlords replaced these independent pricing and supply decisions with collusion.* With its growing popularity within the industry, Landlords agreed to use RealPage's software AI Revenue Management (also known as YieldStar, LRO, or AI Forecasting) ("RealPage Software"), which collects real-time pricing and supply levels and determined daily rates for available rental units. ***Landlords agreed to follow RealPage Software's rental pricing recommendations 80-90 percent of the time and faced disciplinary***

1   *action for non-compliance based on the expectation that competing Landlords would do the*
2   *same.*

3       3.      To be clear, RealPage Software had been available long before 2016. Sometime

4   around 2016, however, the industry's use of the pricing software began to achieve "critical

5   mass[,]" according to one trade group.



**RealPage's Website (realpage.com)**

24      4.      On November 1, 2022, U.S. Senator Sherrod Brown, the chair of the Senate

25  Committee on Banking, Housing, and Urban Affairs, urged the Federal Trade Commission

26  ("FTC") to examine software sold by RealPage after a ProPublica investigation revealed possible

27  collusion. Senator Brown stated, "Renters should have the power to negotiate fairly priced

28  housing, free from illicit collusion, and deceptive pricing techniques."

5. Per one executive from the rental industry, while all Landlords "would be better off limiting their rent reductions [discounts]," if any Landlord "lower[ed] their rents while the others don't, then that [Landlord] would outperform." As a former industry executive explained, the market structure is "a classic prisoners' dilemma."

6. RealPage developed RealPage Software, which sets prices of Landlords' apartments across the country using RealPage's proprietary algorithm.[1] RealPage Software not only uses information about the apartment to be priced and the property in which it is located but also uses private data about the rents of nearby competitors. By using RealPage Software, Landlords succeeded in colluding to increase lease prices to Plaintiffs and other members of the Class (defined *infra*).

7. According to RealPage's website, it "balance(s) supply and demand to maximize [Landlords'] revenue growth."[2] ***RealPage discourages bargaining with renters and has even recommended that Landlords in some cases accept a lower occupancy rate to raise rents and make more money.*** In this manner, RealPage and Landlords used RealPage Software to facilitate an agreement not to compete on and to fix and raise apartment prices through these mutually reinforcing mechanisms in furtherance of anticompetitive price suppression for multifamily residential property leases. Shockingly, by its own admission, RealPage states that RealPage Software can help participating Landlords "outperform the market 3% to 7%[.]"[3]

8. This process of collusion was executed between Landlords and RealPage in the following manner: The scheme operates on the basic principle that the more property managers who sign up for RealPage services, the more data flows into the company's repository. Upon joining the platform, Landlords "outsource daily pricing and ongoing revenue oversight" to RealPage. The historical and contemporaneous pricing data collected by RealPage is updated from participating Landlords, "every time [Landlords] make or change a [lease] renewal offer,"

---

[1] Heather Vogell, *et al.*, *Rent Going up? One Company's Algorithm Could Be Why*, PROPUBLICA (Oct. 15, 2022), https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent.
[2] *Id.*
[3] *Id.*

CLASS ACTION COMPLAINT                        3                        Cotchett, Pitre & McCarthy LLP
(Case Number:            )   Document 1      Filed 12/09/22       Page 6 of 39   999 N. Northlake Way, Suite 215
                                                                                Seattle, WA  98103

Case 3:23-cv-00337   Document 1   Filed 12/09/22   Page 6 of 39   PageID.6

spanning over "16 million units," which is a "very large chunk of the total inventory in the country." It standardizes this data to account for differences in the characteristics or "class" of the property in question and then sets prices for participating Landlords using a common formula.

9. In addition to setting this pricing matrix, RealPage also takes to "disciplining" renegade Landlords who reject their prices. The RealPage User Group — the forum for property managers who use RealPage's products, encourages rivals to work together. RealPage's own website notes the group aims to "promote communications between users," among other things. To make this common scheme a success, RealPage explains that Landlords must accept the pricing at least eighty percent of the time for there to be an effective increase in rents. As one Landlord explains, while "we are all technically competitors," RealPage "helps us work together," "to work with a community in pricing strategies, not to work separately."

10. Following this adherence to prices, RealPage allows participating Landlords to coordinate and artificially reduce lease supply levels to avoid price competition. In a competitive market, there are periods where supply exceeds demand, which puts downward pressure on market prices as firms compete to attract renters. However, contrary to the natural play of market forces and to avoid lawful competition, RealPage provides Landlords with information to hold vacant rental units for periods of time to ensure that oversupply does not preclude rental price hikes. Although RealPage claims its Software will increase revenue and decrease vacancies, it continues to urge Landlords and other property managers to reduce supply while increasing price.[4]

11. This artificial supply reduction combined with discouraging bargaining with renters allow Landlords that use RealPage to increase rents and make more money.[5] This is the overarching tenet of RealPage's business—reducing physical occupancy to maximize profits by increasing rents. In this manner, Defendants' concerted efforts have resulted in a manipulation of

---

[4] Vogell, *et al., supra* note 1.
[5] *Id.*

market forces, increased rents, decreased physical occupancy, and caused harm to consumer renters.

12. According to RealPage, participating Landlords experience "[r]ental rate improvements, year over year, between 5% and 12% in every market." One Landlord said that the net effect of raising rents and "pushing people out" of the residential real estate leases they could no longer afford, was "$10 million in income." This collusion resulted in tremendous profits to one Landlord who outperformed markets by nearly 4.8% even during a market downturn.[6] In fact, RealPage actively helps Landlords collude on rental pricing by offering them regular reports, commercially sensitive competitor data, and pricing indices to ensure standard rates on all leases. One such example is RealPage's webpage, "Find out how YieldStar can help you outperform the market 3% to 7%,"[7] wherein RealPage urges potential clients on its website to raise rents to ensure outperformance within the market.

13. In the same video, a RealPage Vice President discussed the recent and unprecedented increases for residential real estate leases, as high as 14.5% in some markets. When another RealPage executive asks: "What role has the [RealPage] software played" in those increases, the RealPage Vice President responded: "I think it's driving it, quite honestly."

14. As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Class (defined *infra*) paid artificially inflated prices for rental leases beginning at least as early as 2016 and continuing thereafter. The conduct is continuing. Plaintiffs bring this action to recover their damages, trebled, as well as injunctive and other appropriate relief, detailed *infra*, on behalf of all others similarly situated.

## III. JURISDICTION

15. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as well as 15 U.S.C. § 15.

---

[6] *Id.*
[7] *Id.*

16.     This Court has personal jurisdiction over the Defendants because they directed their tortious conduct at persons and activities within the State of Washington, and under Washington's long-arm statute, the Revised Code of Washington § 4.28.185.

17.     This Court has personal jurisdiction over the Defendants because the Defendants either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) managed multifamily residential property leases throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) were engaged in an illegal conspiracy to fix, raise, maintain, or stabilize rental prices and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. The Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States.

## IV.     VENUE

18.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and the Defendants variously reside, are licensed to do business, are doing business, have agents in, and/or are found in or transact business in this District.

19.     Upon Plaintiffs' investigation, hundreds of multifamily residential communities involving thousands of rental units managed and leased by Defendant Landlords are located within this District and across Seattle. The Defendant Landlords use RealPage Software to manage many of these buildings, and together they control tens of thousands of rental units in Seattle. Seattle consistently has one of the highest rents in the United States.

CLASS ACTION COMPLAINT                                    6                          Cotchett, Pitre & McCarthy LLP
(Case Number:              )                                                        999 N Northlake Way, Suite 215
                                                                                    Seattle, WA  98103

Case 3:23-cv-00337   Document 1   Filed 12/09/22   Page 9 of 39   PageID 9

## V.  PARTIES

20.  Plaintiff **John Pham** is a resident of Seattle, Washington. He has rented a multifamily residential unit in a property known as Ascent South Lake Union in Seattle, Washington from November 2020 through the present. Landlord Defendant Greystar Real Estate Partners, LLC manages this property using RealPage Software. Consequently, Mr. Pham paid higher rental prices by reason of the violation alleged herein.

21.  Plaintiff **Diana Lazarte** is a resident of San Bruno, California. She has rented a multifamily residential unit in a property known as Acappella Apartments in San Bruno, California from November 2021 through the present. Landlord Defendant Greystar Real Estate Partners, LLC managed this property using RealPage Software. Consequently, Ms. Lazarte paid higher rental prices by reason of the violation alleged herein.

22.  Plaintiff **Marco Cuevas** is a resident of Rancho Santa Margarita, California. He has rented a multifamily residential unit in a property known as SkyView in Rancho Santa Margarita, California, from March 2020 through the present. Landlord Defendant Equity Residential managed this property through its agent, Equity Residential Management, L.L.C., using RealPage Software. Consequently, Mr. Cuevas paid higher rental prices by reason of the violation alleged herein.

23.  Plaintiff **Valdamitra Anderson** is a resident of San Marcos, California. She has rented a multifamily residential unit in a property known as Overture San Marcos in San Marcos, California, from December 2019 through the present. Landlord Defendant Greystar Real Estate Partners, LLC managed this property through its agents, CRP-GREP Vallecitos Owner LLC, GS AA San Marcos Owner, LLC, and Overture San Marcos, using RealPage Software. Consequently, Ms. Anderson paid higher rental prices by reason of the violation alleged herein.

24.  Plaintiff **Michael Poole** is a resident of Los Angeles, California. He has rented a multifamily residential unit in a property known as LA Plaza Village in Los Angeles, California, from at least January 2019 through the present. Landlord Defendant Greystar Real Estate Partners, LLC managed the property through its agent, LA Plaza Village LLC, using RealPage

CLASS ACTION COMPLAINT     7     Cotchett, Pitre & McCarthy LLP
(Case Number)     999 N. Northlake Way, Suite 215
Seattle, WA  98103

Case 3:25-cv-00337    Document 1    Filed 12/09/22    Page 10 of 39 PageID #: 10

Software. Consequently. Mr. Poole paid higher rental prices by reason of the violation alleged herein.

25. Plaintiff **Daniel Flowers** is a resident of Fort Lauderdale, Florida. He has rented a multifamily residential unit in a property known as Novo Las Olas in Fort Lauderdale, Florida from April 2021 through the present. Landlord Defendant Greystar Real Estate Partners, LLC managed this property using RealPage Software. Consequently, Mr. Flowers paid higher rental prices by reason of the violation alleged herein.

26. **Defendant RealPage** is a Delaware corporation headquartered in Richardson, Texas. It has nearly 31,700 customers that together control the critical mass of rental real estate in the United States. RealPage has thousands of employees and earns over a billion dollars per year in revenue. RealPage Software is used by property managers, including Landlords across Washington. RealPage was a public company from 2010 until December 2020, when it was purchased by private equity firm Thomas Bravo in a transaction that valued RealPage at approximately $10.2 billion. RealPage Software has encouraged and enabled Landlords to artificially raise the rental prices of their multifamily residential property leases.

27. **Landlord Defendant Avenue5 Residential, LLC ("Avenue5")** is a Delaware limited liability company headquartered in Seattle, Washington. Avenue5 is the twelfth largest manager of multifamily rental real estate across the United States, with over 96,900 multifamily units under management in 12 states. On information and belief, Avenue5 earns over $500 million dollars per year in revenue and employs over 1,000 people. Avenue5 uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

28. **Landlord Defendant BH Management Services, LLC ("BH")** is a Florida limited liability corporation headquartered in Des Moines, Iowa. On information and belief, BH manages over 100,000 units and employs 2,600 people across the country. BH has discussed using RealPage Software successfully to allow insight into what its competitors' pricing decisions and how to avoid "subjectively adjusting to what the market is doing."[8] BH uses

---

[8] Tim Blackwell, *Six Ways Revenue Management Software Benefits B and C Properties*, REALPAGE (June 12, 2019), https://www.realpage.com/blog/six-ways-revenue-management-software-benefits-b-c-properties/ (last accessed Nov. 4, 2022).

CLASS ACTION COMPLAINT
8
Cotchett, Pitre & McCarthy LLP
(Case Number)
999 N. Northlake Way, Suite 215
Seattle, WA 98103

Case 3:23-cv-00337    Document 1    Filed 12/09/22    Page 11 of 39 PageID 11

RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

29.     **Landlord Defendant Cushman & Wakefield, Inc. ("Cushman & Wakefield"),** is a Delaware corporation headquartered in New York, New York. It is the third largest commercial real estate services firm in the world. Its subsidiary, Pinnacle Property Management Services, LLC ("Pinnacle") is headquartered in Addison, Texas. Pinnacle has more than 4,500 employees who manage apartment communities in 32 states, Washington D.C., and Canada. Pinnacle President and CEO, Rick Graf, has discussed how using RealPage Software has allowed Pinnacle to outperform its competitors during down market cycles: "Initially, skeptical about RealPage Revenue Management's ability to outperform during down market cycles, Graf was pleasantly surprised to experience the opposite outcome[,] a 4% revenue lift when the market took a severe dive that left many owner/operators without RealPage making concessions that proved detrimental to their profitability."[9] Cushman &Wakefield as well as Pinnacle use RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

30.     **Landlord Defendant Equity Residential ("Equity")** is a Maryland real estate investment trust headquartered in Chicago, Illinois. Equity is the sixteenth largest manager of multifamily rental real estate in the United States. As of December 31, 2021, the company owned or had investments in 310 properties consisting of 80,407 apartment units in Southern California, San Francisco, Washington, D.C., New York City, Boston, Seattle, Denver, Atlanta, Dallas/Fort Worth, and Austin. On information and belief, Equity earns over $2 billion dollars per year in revenue and employs over 2,000 people. Equity uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

31.     **Landlord Defendant FPI Management, Inc. ("FPI")** is a California corporation headquartered in Folsom, California. FPI is the fifth largest manager of multifamily rental real

---

[9]  Rick Graf, Pinnacle CEO, on RealPage Revenue Management's 4% Revenue Lift, REALPAGE, https://www.realpage.com/videos/rick-graf-pinnacle-yieldstar-revenue-lift/ (last accessed Nov. 4, 2022).

---

estate in the United States, with over 150,000 multifamily units under management in 17 states. FPI uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

32. **Landlord Defendant Greystar Real Estate Partners, LLC ("Greystar")** is a Delaware limited liability corporation headquartered in Charleston, South Carolina. A significant RealPage client, it is the largest manager of multifamily rental real estate in the United States and manages over 782,900 multifamily units and student beds nationally. RealPage has used Greystar's success in the leasing market as a case study on several occasions across its website.[10] Greystar earns billions of dollars per year in revenue, controls $35.5 billion dollars in assets, and employs over 20,000 people. It has a history of large acquisitions of privately owned apartment management companies, and now controls hundreds of buildings in metro areas where rents have risen exorbitantly in recent years.[11] Greystar uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

33. **Landlord Defendant Lincoln Property Co. ("Lincoln")** is a Texas corporation headquartered in Dallas, Texas. It is a privately-owned real estate firm involved in real estate investment, development, property management and leasing worldwide. It is the second largest manager of multifamily rental real estate in the United States, and its cumulative development efforts have produced over 130 million square feet of commercial space and over 212,000 multifamily residential units. Lincoln uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

34. **Landlord Defendant Mid-America Apartment Communities, Inc. ("MAA")** is a Tennessee corporation headquartered in Germantown, Tennessee. MAA is the tenth largest manager of multifamily rental real estate in the United States. As of December 31, 2020, the company owned 300 apartment communities containing 100,490 apartment units. MAA uses

---

[10] RealPage, *Search Results for Greystar,* https://www.realpage.com/search/?query=greystar (last accessed Oct. 30, 2022).
[11] Broffman, *Game Changer*, YIELDPRO (Aug. 1, 2014), https://yieldpro.com/2014/08/game-changer/ (last accessed Oct. 31, 2022)

CLASS ACTION COMPLAINT    10    Cotchett, Pitre & McCarthy LLP
(Case Number)    999 N. Northlake Way, Suite 215
Seattle, WA 98103

Case 3:23-cv-00337    Document 1    Filed 12/09/22    Page 13 of 39 PageID 13

RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

35. **Landlord Defendant Security Properties Inc. ("Security Properties")** is a Washington corporation headquartered in Seattle, Washington. Security Properties has over 22,000 units under management in 18 states. On information and belief, Security Properties earns millions of dollars per year in revenue. Security Properties uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

36. **Landlord Defendant Thrive Communities Management, LLC ("Thrive")** is a Washington limited liability company headquartered in Seattle, Washington. Thrive has over 18,000 units under management in the greater Pacific Northwest. On information and belief, Thrive earns millions of dollars per year in revenue and employs over 500 people. Thrive uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

37. **Landlord Defendant UDR, Inc. ("UDR")** is a Maryland corporation headquartered in Highlands Ranch, Colorado. UDR has 53,229 units in 160 communities located in 21 markets under management in the United States. It is the 19th largest owner of apartments in the United States and the 30th largest apartment property manager in the United States. UDR uses RealPage Software to artificially raise the rental prices of its multifamily residential property leases.

## VI. DEFENDANTS' AGENTS

38. Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

39. Each Defendant acted as an agent for each other with respect to the acts and violations alleged herein.

CLASS ACTION COMPLAINT        11        Cotchett, Pitre & McCarthy LLP
(Case Number)        999 N. Northlake Way, Suite 215
Seattle, WA 98103

Case 3:23-cv-00337    Document 1    Filed 12/09/22    Page 14 of 39 PageID.14

40. Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as agents with the Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of misconduct and concealment alleged herein.

41. Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

42. Plaintiffs and the Class were harmed by Defendants' misconduct and concealment. Defendants are responsible for the harm because RealPage aided and abetted the Landlord Defendants in committing the misconduct and concealment.

43. Although RealPage is responsible for creating and selling the RealPage Software, the Landlord Defendants are responsible for using it and implementing the prices set forth by the software algorithm. The Landlord Defendants are responsible because they were aware that RealPage Software was intended to raise rental prices of multifamily residential property leases and reduce the supply of them. Nevertheless, the Landlord Defendants employed the RealPage Software, thereby showing that they had the specific intent to facilitate the misconduct that RealPage undertook.

## VII. FACTUAL BACKGROUND

### A. The Market for Multifamily Residential Property Leases

44. The relevant product market is the market for the lease of multifamily residential rental properties and the relevant geographic market, which is comprised of relevant sub-markets, is the United States.

45. There are no other close economic substitutes to this product market. For example, the purchase of residential property requires the ability to make a substantial down payment and to obtain financing. Furthermore, non-multifamily residential properties typically

do not offer amenities and/or other forms of similar security. For this reason, customer preferences do not consider these two markets to be close substitutes to the multifamily residential rental property market when met with anticompetitive and exalted pricing.

46.     The multifamily residential rental property market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined and does not encompass sufficient economic substitutes.



**Various multifamily residential properties in Seattle and the San Francisco Bay Area (https://www.greystar.com/search)**

47.     Here, the SSNIP test is satisfied, and the market is properly defined. As described above and below, pursuant to the Landlords' agreement not to compete on price, Landlords are able to increase "year over year, between 5% and 12% in every market," yet those increases have

CLASS ACTION COMPLAINT                    13                    Cotchett, Pitre & McCarthy LLP
(Case Number)                                                   999 N. Northlake Way, Suite 215
                                                                Seattle, WA  98103

Case 3:23-cv-00337     Document 1     Filed 12/09/22     Page 16 of 39     PageID #.16

not driven enough renters out of the market such that the SSNIP has become unprofitable to Landlords.

**B.     Historical Pricing in the Market for Multifamily Residential Property Leases**

48.     Prior to 2016, Landlords operated independently in pricing their units. An unrented Prior to participation in the conspiracy alleged herein, sometime prior to about 2016, Landlords operated independently in pricing their units. An unrented property was a lost opportunity to earn revenue for that day, and therefore, Landlords offered sufficiently attractive pricing to maintain maximum "physical occupancy" across their units. This could come in the form of reduced prices—often termed concessions—such as "first eight weeks free," "one-month free parking," among others.

49.     The "heads in the beds" strategy also minimized turnover expenses, as there were hard costs associated with finding and evaluating a replacement tenant as well as lost revenue opportunities if the unit sat vacant between tenants.

50.     In this manner, landlords across the country who do not use RealPage Software have worked towards ensuring maximum physical occupancy and, in doing so, also manually and independently reduced prices of units to attract tenants to sign or renew existing leases. Ergo, independently taken pricing decisions have ensured a market share strategy over high pricing strategy, thereby permitting the market to operate under conditions of fair competition.

**C.     The Landlord Defendants' Outsource Price and Supply Decisions to a Common Decision Maker—RealPage—and Used RealPage Software to Eliminate Competition**

51.     Around 2016, a greater number of property managers began signing onto RealPage's services—most importantly, the RealPage Software. Shockingly, this Software was primarily designed by a former Director of Revenue Management at Alaska Airlines. It was during this Director's time at Alaska Airlines that the Department of Justice reached settlements or consent decrees for price fixing with eight airlines, including Alaska Airlines, for using technology that artificially inflated airfares, costing consumers more than a billion dollars between 1988 and 1992. With the use of RealPage Software, Landlords shifted from the previous

CLASS ACTION COMPLAINT                                    14                        Cotchett, Pitre & McCarthy LLP
(Case Number)                                                                          999 N. Northlake Way, Suite 215
                                                                                                    Seattle, WA  98103

Case 3:25-cv-00337     Document 1     Filed 12/09/22     Page 17 of 39     PageID 17

competitive market share over price strategy to a new collusive price over volume strategy. Price over volume is a hallmark of pricing in a cartelized market.



**RealPage Software (https://www.realpage.com/multifamily/)**

### 1.    Mutually Accepted Price Matrix

52.    More recently, RealPage renamed its combined pricing software AI Revenue Management. ***By the end of 2020, the firm was reporting in a Securities and Exchange Commission filing that its clients used its services and products to manage 19.7 million rental units of all types.***

53.    One industry executive stated that while all Landlords "would be better off limiting their rent reductions [discounts]," if any Landlord "lower[ed] their rents while the others don't, than that [Landlord] would outperform." The easiest fix to this prisoner's dilemma, and to maintain higher prices and maximize profits would be if Landlords had mutual assurances that other Landlords would not compete with them on price. ***Due to a market-wide prisoner's dilemma, RealPage recommended, and Landlords followed the principle that revenue maximization is possible only if all participants adhere to the pricing matrix.***[12]

54.    RealPage and Landlords mutually agree to accept the pricing matrix offered by RealPage and not compete on the price of rental units. One of the algorithm's developers notes

---

[12] RealPage, *Frequently Asked Questions about Revenue Management* Software at 2, https://www.realpage.com/storage/files/pages/faqs/pdfs/2022/10/revenue-management-faqs.pdf (last accessed Oct. 31, 2022).

CLASS ACTION COMPLAINT                                15                    Cotchett, Pitre & McCarthy LLP
(Case Number)                                                                    999 N. Northlake Way, Suite 215
                                                                                             Seattle, WA  98103

Case 3:25-cv-00337      Document 1      Filed 12/09/22      Page 18 of 39      PageID 18

that leasing agents had "too much empathy" unlike computer-generated pricing. RealPage discourages bargaining with renters and recommends that landlords sometimes accept lower occupancy rates to raise rents and make more money.



55. With the help of RealPage Software, Landlords have found that keeping the building emptier but rents higher results in higher returns, which works against the consumer renter. In this manner, RealPage and Landlord Defendants reinforced coordinated algorithmic pricing and staggering lease renewal dates to avoid (otherwise natural) oversupplies in rental properties. One Landlord explained that, using RealPage, Landlords are "now able to stagger lease expirations throughout the month, effectively cutting down on frictional vacancy loss as well as concessions" on price.

56. In RealPage's own words, Landlords "outsource [their] daily pricing and ongoing revenue oversight" to RealPage, with RealPage pricing participating Landlords' "properties as if we [RealPage] own them ourselves"—that is, as if RealPage and its participating Landlords were operating as a monopolist.

### 2. Price-Fixing Mechanism

57. Landlords agree to adhere to RealPage's coordinated algorithmic pricing, often referring to such adherence as pricing "courage" or more frequently, pricing "discipline."

58. Participating Landlords also agree to provide RealPage with real-time access to their competitively sensitive and nonpublic data on their multifamily residential property leases, which spans over "16 million units," a "very large chunk of the total inventory in the country."

CLASS ACTION COMPLAINT 16 Cotchett, Pitre & McCarthy LLP
(Case Number) 999 N. Northlake Way, Suite 215
Seattle, WA 98103

Case 3:25-cv-00337 Document 1 Filed 12/09/22 Page 19 of 39 PageID 19

RealPage's data warehouse provides access to actual lease transactions — giving it the true rents paid, instead of simply those a landlord advertised. RealPage standardizes this data to account for differences in the characteristics or "class" of the property in question.

59. RealPage then runs this massive dataset through its pricing algorithm, whereby RealPage sets prices for participating Landlords through application of a common formula to a common dataset. In addition, RealPage Software also benchmarks review, expenses, and operational metrics, and provides daily updates to participating Landlords, all of which are used to maintain a collusive price across the market.[13]



**RealPage Video providing insights on Rent Maximization to Landlords**

60. Specifically, every morning, RealPage provides participating Landlords with recommended price levels. This is done through a RealPage "Pricing Advisor." Landlords then let the "Pricing Advisor" know that they have "accept[ed]" or "confirm[ed] the "approved pricing" within a specified time frame. If Landlords wish to diverge from the "approved pricing" they must submit reasoning for doing so and await approval. RealPage encourages participating

---

[13] RealPage, *RealPage Performance Analytics Benchmarking*, https://www.realpage.com/asset-optimization/benchmarking/ (last accessed October 31, 2022).

Landlords to have daily calls between the Landlords' employees with pricing responsibility and the RealPage Pricing Advisor.

### 3. RealPage Disciplines Landlords on Pricing

61. RealPage emphasizes discipline among participating Landlords and urges them that for RealPage's coordinated algorithmic pricing to be the most successful in increasing rents, participating Landlords must adopt RealPage's pricing at least 80% of the time. In fact, RealPage's own "fact sheet" on its software goes on to state that "RealPage strongly advises its customers that agreement with the model 100% of the time may indicate ineffective use of the solution."[14] As noted by the architect of RealPage Software, Jeffrey Roper, ***"If you have idiots undervaluing [setting prices independently], it costs the whole system."***

62. This has been a rather successful form of coercion as noted by a RealPage employee, who states that as many as 90% (and at least 80%) of RealPage pricing is adopted. As one Landlord explained, RealPage's coordinated algorithmic pricing required counterintuitive changes in their business practices "because [ upon adopting RealPage's coordination of pricing,] we weren't offering concessions nor were we able to negotiate pricing" like they previously had. Another Landlord described RealPage as bringing "discipline" and "courage to pricing."



**RealPage Video providing insights on Rent Maximization to Landlords**

---

[14] RealPage, *supra* note 12.

CLASS ACTION COMPLAINT                    18                    Cotchett, Pitre & McCarthy LLP
(Case Number)                                                   999 N. Northlake Way, Suite 215
                                                                Seattle, WA 98103

Case 3:25-cv-00337    Document 1    Filed 12/09/22    Page 21 of 39    PageID 21

63. Using software it designed, applied to the dataset participating Landlords agreed to provide it, RealPage also allows participating Landlords to stagger their lease renewals to avoid natural periods of oversupply that would persist absent concerted action by would-be rival Landlords.

64. In this manner, Landlords have "leveled the lease expirations throughout the year to better match the historical demand for each community, thus positioning us [Landlords] for even higher rent growth."

65. Landlords have publicly admitted that RealPage has allowed them to maintain higher prices in concert, with confidence that they can avoid price cutting and the prisoner's dilemma.

66. This same Landlord commented that while "we [Landlords] are all technically competitors," that Landlords' common adoption of and adherence to RealPage's software "helps us [Landlords] work together," "to work with a community in pricing strategies, not to work separately."

67. Other Landlords' comments echo the potency and efficacy of their concerted action.

68. Another Landlord explained that by "outsourcing" pricing functions to RealPage, prices are set by RealPage's "multifamily experts," "who essentially act like an extension of our team."

69. Landlords note that "the net effect of driving revenue and pushing people out was $10 million in income." This means that economic self-interest is served only if rivals do not undercut one another. RealPage provides this mechanism in RealPage Software through which Landlords reach a common understanding, coordinate their prices, and effectuate that understanding.

**D.     The Landlord Defendants and RealPage Created Anticompetitive Rental Pricing and Reduced Occupancy**

70.     According to RealPage executive, Andrew Bowen, "it's [RealPage's coordinated algorithmic pricing is] driving it [higher prices for residential real estate leases], quite honestly."[15]

71.     RealPage advertises that the Landlords that participate in this cartel experience "[r]ental rate improvements, year over year, between 5% to 12% in every market," the ability to "outperform the market by up to 5%," and "drive up to an additional 150-200 basis points of hidden yield" that would not otherwise be attainable to a Landlord utilizing independent pricing, rather than coordinated pricing. ProPublica reported that Greystar, a loyal RealPage client, was able to perform better than the markets it operates in by almost 5% when it used RealPage Software to set rent prices.[16]

72.     RealPage refers to independent, competitive pricing as "manual pricing." RealPage claims to "outperform manual pricing" by 7 percent each year. That is, the Landlords' collusion succeeds in increasing prices above competitive levels by 7 percent each year.

73.     One Landlord's representative explained, "the beauty of using [RealPage's pricing] is that it pushes [Landlords] to go places that you wouldn't have gone on your own if you weren't using it." At a recent conference, another representative noted that they would not have had "the courage to push [rents] as aggressively as [the RealPage pricing] program has."

74.     Another Landlord admitted that, in the natural state of play, it simply is "not in [a Landlord's] DNA to raise pricing $150 to $200 per unit on a lease turn," but following RealPage's coordinated algorithmic pricing allowed the Landlord to do what, independently, it would not.

75.     And yet another Landlord observed that it was able to raise rents in situations where market conditions dictated otherwise, with a consultant for that Landlord conceding that "[i]f you'd listened to your gut, you would have lowered your price."

---

[15] Vogell, *et al., supra* note 1.
[16] *Id.*

CLASS ACTION COMPLAINT                    20                    Cotchett, Pitre & McCarthy LLP
(Case Number)                                                      900 N. Northlake Way, Suite 215
                                                                   Seattle, WA  98103

Case 3:25-cv-00337     Document 1     Filed 12/09/22     Page 23 of 39     PageID 23

76.     RealPage has not been shy about admitting that its price levels are impossible to achieve independently, stating: "We believe in overseeing properties as though we own them ourselves. We believe we can deliver better results for you than you would otherwise be able to achieve." In other words, RealPage concedes that its coordinated algorithmic pricing allows Landlords to obtain the same results as a single seller or monopolist—an outcome Landlords "would not otherwise be able to achieve" without RealPage's pricing and assurances of Landlords' discipline to that pricing.

77.     RealPage and Landlords continued their insidious ways throughout the COVID-19 pandemic and flagrantly noted that "the reality is that rents can only rise as incomes rise." A RealPage Vice President of Revenue Management explained that "at the start of Covid, I think a lot of our [Landlords'] initial reaction, was, 'oh I need to start dropping rent, I need to start giving concessions" to account for the exodus of renters from major metropolitan areas. But "our [RealPage's] advisory team and the product did a great job" of resisting that natural competitive outcome. Another RealPage employee agreed with that assessment, noting "we just saw unbelievable resilience and I would say discipline in pricing through the worst of the downturns…a lot of people thought we'd see severe rent cuts; that just didn't happen."

78.     As mentioned, *supra*, the main architect of RealPage Software is not a stranger to the workings of collusive algorithmic software—having orchestrated an industry wide collusion on behalf of Alaska Air in the 1980s, which drew the attention of several regulators. Having now brought analogous coordinated algorithmic pricing to multifamily residential properties leasing after the DOJ's airline settlements, however, Mr. Roper can no longer claim ignorance of the unlawful nature of this conduct.

E.     **"Plus Factors" Render the Market for Multifamily Residential Property Leases Susceptible to the Formation, Maintenance, and Efficacy of a Cartel**

79.     The relevant market is characterized by numerous features that render the industry susceptible to collusion, such that the formation, maintenance, and efficacy of a cartel is more likely. These factors include (1) high barriers to entry, (2) high barriers to exit, (3) inelastic consumer demand, (4) market concentration, (5) exchanges of competitively sensitive

information among horizontal competitors, and (6) numerous opportunities to collude at trade associations and RealPage functions.

### 1. High Barriers to Entry

80.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, entry barriers help to facilitate the formation and maintenance of a cartel. Multifamily residential real estate properties owners and operators face significant entry barriers, such as high maintenance costs, regulatory compliance, high acquisition costs, labor costs, high construction costs, and high cost of acquiring property and establishing a property management infrastructure. Even small multifamily rental properties cost millions of dollars to acquire. Large properties, such as those operated by Greystar, run into the hundreds of millions of dollars to own and manage. They take several years and significant experience to build or acquire. Thus, new entrants into the residential real estate leasing market are unlikely to discipline cartel pricing.

### 2. High Barriers to Exit

81.    It is nearly impossible for renters to discipline cartel pricing due to high exit barriers in this market. Renters incur substantial cost and inconvenience when moving and, where price escalation is occurring in broad geographic areas, they might not have a lower priced option in reasonable proximity to where they currently live or work.

### 3. Inelastic Consumer Demand

82.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

CLASS ACTION COMPLAINT                                    22                Cotchett, Pitre & McCarthy LLP
(Case Number)                                                                      999 N. Northlake Way, Suite 215
                                                                                              Seattle, WA  98103

Case 3:25-cv-00337    Document 1    Filed 12/09/22    Page 25 of 39    PageID

83. The demand for multifamily residential property leases is relatively inelastic. The only realistic alternative to renting is buying, which is seldom an option for renters who do not usually have the liquid capital to do so on short notice. Thus, no reasonable substitutes exist to discipline cartel pricing.

### 4. Market Concentration

84. A highly concentrated market is more susceptible to collusion and other anticompetitive practices. RealPage dominates the property management software market, and Landlord Defendants dominant the multifamily residential properties market in areas throughout the country. Taken together, the Landlords hold a staggering market share of multifamily residential property leases in this country. The market for residential real estate property leases is highly concentrated, with Landlords and other smaller participants ferociously acquiring any emerging players in the market.[17] Most major metropolitan areas are dominated by relatively few property managers, with many large corporations like Greystar and Lincoln having substantial presences in metropolitan areas throughout the United States.

### 5. Exchanges of Competitively Sensitive Information Among Horizontal Competitors

85. RealPage's participating Landlords, directly and by using RealPage as a conduit, indirectly, competitively sensitive information with one another. Several experts warn that the RealPage User Group is a platform used for price-setting and lease renewal-staggering services. RealPage collects non-public data on multifamily residential properties and creates benchmarking reports that allow for quick comparisons of a Landlord's performance on occupancy and price for similar property classes vis-à-vis the industry. This function could not be recreated using any public, non-competitively sensitive source as the advertised rates for residential real estate leases typically diverge from the actual rates.

---

[17] Broffman, *supra* note 11.

CLASS ACTION COMPLAINT
(Case Number)
23
Cotchett, Pitre & McCarthy LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

Case 3:25-cv-00337    Document 1    Filed 12/09/22    Page 26 of 39    PageID 26

### 6. Numerous Opportunities to Collude at Trade Associations And RealPage Functions

86. RealPage and participating Landlords have ample opportunities to collude. A stark example of this is the private members' only **RealPage User Group Forum**, an association of some thousand participating Landlords, which, according to RealPage, aims "to improve communications between RealPage and the user [Landlord] community," while "promot[ing] communication between users [Landlords]" themselves. Under the tab, "**Idea Exchange**," Landlords submit their own recommendations for changes or improvements to RealPage's offerings as well as provide comments on proposed changes that RealPage is considering implementing to its software offerings.[18] Several subcommittees comprising of property management companies across the country unequivocally exhibit how RealPage uses its platform for industry-wide collusion. Starting out with 10 members in 2003, the group has grown to more than 1,000 participants. A dozen subcommittees, including two focused on revenue management, meet in invitation-only sessions at the company's annual conference, RealWorld, and participate in a conference call each quarter.

87. As another example, RealPage organizes certain in-person events and collaborations among participating Landlords. It invites some to serve on a "Steering Committee," which liaises with certain subcommittees of the RealPage User Group Forum to ascertain Landlords' suggestions for RealPage's software offerings and with the explicit instruction to consider "the mutual benefit of all users." At RealWorld, Landlords gather along with approved partners and executives from RealPage to network, exchange insights into key initiatives in the industry, and learn best practices for using RealPage tools. This conference has been held across the country, more recently in Las Vegas, Nevada, Nashville, Tennessee, Orlando, Florida, and virtually during the pandemic.

88. RealPage has also invited Landlords to attend periodic "summits" to discuss RealPage's pricing software with RealPage and with one another, covering topics including (1)

---

[18] RealPage, *Idea Exchange*, https://www.realpage.com/user-group/idea-exchange/ (last accessed October 31, 2022).

"Competitive Rent Analysis" or "[m]ethods of establishing and maintaining amenity-based prices for each unit and floor plan, factoring in comparable peer pricing," (2) "Supply Forecasts" and "Demand Forecasts," as well as (3) RealPage's "Pricing Engine," or "[m]ethods to price units in real time based on statistically validated price elasticity models."

89.     Trade associations have also played an active role by offering RealPage and participating Landlords additional opportunities to conspire. The National Multifamily Housing Council ("NMHC"), a "place where the leaders of the apartment industry come together to guide their future success," holds several events every year, including an in person "Apartment Strategy Conference," an "Annual Meeting," a "Fall Meeting," which are actively sponsored by RealPage, Greystar, and other participating Landlords. Of note, NMHC "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics including "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals."

## VIII.   CALL FOR FTC INVESTIGATION

90.     As stated, *supra*, on November 1, 2022, U.S. Senator Sherrod Brown urged FTC Chair Lina Khan "to review the current use of price optimization software employed by property owners to set rents. According to recent reports, the collection and use of rent data in price optimization software is allowing for anticompetitive and potentially unlawful collusion among competitors at the expense of consumers."

91.     Senator Brown noted that:

> Alarmingly, recent reporting by ProPublica highlighted that RealPage's algorithm-based price optimization software, YieldStar, is being used by a growing number of property managers and landlords, potentially impacting pricing and the supply of homes in the rental market. This software uses data analytics to suggest rent prices to landlords on a day-by-day basis, with the clear-cut purpose of maximizing revenue. RealPage reported to the Securities and Exchange Commission that as of 2020, they helped manage the operations of millions of units and that their clients, who use one or more of their software products, included the nation's ten largest multifamily property management companies.

CLASS ACTION COMPLAINT                                          25                         Cotchett, Pitre & McCarthy LLP
(Case Number)                                                                                    999 N. Northlake Way, Suite 215
                                                                                                            Seattle, WA 98103

Case 3:25-cv-00337     Document 1     Filed 12/09/22     Page 28 of 39     PageID.28

## IX. CLASS ACTION ALLEGATIONS

92.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that directly leased at least one multifamily residential property from a Landlord Defendant, or from a division, subsidiary, predecessor, agent, or affiliate of such Landlord Defendant, that uses RealPage Software from January 1, 2016 until the anticompetitive effects of Defendants' unlawful conduct ceased.

93.     Plaintiffs also bring state subclasses based on the states in which they reside, respectively, Washington, California, and Florida state subclasses.

94.     Excluded from the Class are the Defendants and Co-Conspirators, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities. Plaintiffs reserve the right to amend the aforementioned definitions if discovery and further investigation reveal that they should be expanded or otherwise modified.

95.     Plaintiffs properly bring this action as a class action under Rule 23(a) for the following reasons:

(a)     **Numerosity** (Fed. R. Civ. P. 23(a)(1)): The Class is so numerous and geographically dispersed throughout the United States that the joinder of all members of the Class ("Class Members") is impracticable. While Plaintiffs do not know the exact number and identity of all Class Members, Plaintiffs are informed and believe that there are millions of members in the Class. The precise number of Class Members can be ascertained through discovery;

(b)     **Commonality** and **Predominance** (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)): There are questions of law and fact common to the Class which predominate over any questions that may affect particular Class Members. This is particularly true given the nature of the Defendants' conspiracy, which was generally applicable to all the Class Members, thereby making appropriate relief with respect to the Class as

CLASS ACTION COMPLAINT                    26                    Cotchett, Pitre & McCarthy LLP
(Case Number)                                                   999 N. Northlake Way, Suite 215
                                                               Seattle, WA 98103

Case 3:23-cv-00337    Document 1    Filed 12/09/22    Page 29 of 39 PageID.29

a whole;

(c) **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of Class Members. Plaintiffs and the Class have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of the Class and are based on the same legal theories;

(d) **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)): Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interests antagonistic to those of the other Class Members, and Plaintiffs have retained attorneys experienced in antitrust class actions and complex litigation as counsel.

96. Plaintiffs and all Class Members were all injured by the same unlawful conduct, which resulted in all of them paying more for multifamily residential leases than they otherwise would have in a competitive market.

97. Questions of law and fact common to the Class Members will predominate over questions, if any, that may be individual to individual class members, since the Defendants have acted and refused to act on grounds generally applicable to the Class.

98. Questions of law and fact common to the Class include:

(a) Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate the rental price and/or artificially suppress the supply of multifamily residential property leases from competitive levels;

(b) Whether Defendants unjustly enriched themselves to the detriment of Plaintiffs and the Class, thereby entitling Plaintiffs and the Class to disgorgement of all benefits derived by the Defendants;

(c) If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates the Sherman Act;

(d) If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of multifamily residential property leases from competitive levels;

(e) The appropriate injunctive and related equitable relief for the Class; and

(f) The proper measure of damages.

CLASS ACTION COMPLAINT                    27                    Cotchett, Pitre & McCarthy LLP
(Case Number)                                                          999 N. Northlake Way, Suite 215
                                                                                 Seattle, WA  98103

Case 3:23-cv-00337    Document 1    Filed 12/09/22    Page 30 of 39 PageID 30

99.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of antitrust class actions.

100.     Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

**FIRST CAUSE OF ACTION**
**Against All Defendants**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

101.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

102.     Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

103.     The acts done by Defendants as part of, and in furtherance of, its and its co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

104.     From at least January 1, 2016 until the anticompetitive effects of Defendants' unlawful conduct ceased ("Class Period"), Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, or stabilize the rental prices for multifamily residential property leases, thereby creating anticompetitive effects.

105.     The anticompetitive acts were intentionally directed at the geographic markets for multifamily residential property leases identified in the Class Action Allegations and had a substantial and foreseeable effect on interstate commerce by fixing, raising, or stabilizing the rental prices for multifamily residential property leases throughout the United States.

106.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for multifamily residential property leases in the geographic markets identified in the Class Action Allegations.

CLASS ACTION COMPLAINT                    28                    Cotchett, Pitre & McCarthy LLP
(Case Number)                                                                    999 N. Northlake Way, Suite 215
                                                                                              Seattle, WA  98103

Case 3:25-cv-00337     Document 1     Filed 12/09/22     Page 31 of 39     PageID 31

107. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated persons in the Class who leased multifamily residential property have been harmed by being forced to pay inflated, supra-competitive rental prices for multifamily residential property leases.

108. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

109. Defendants and their co-conspirators' conspiracy had the following effects, among others:

      (a)    Price competition in the market for multifamily residential property leases has been restrained, suppressed, and/or eliminated in the geographic markets identified in the Class Action Allegations;

      (b)    Prices for multifamily residential property leases leased by Landlord Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the geographic markets identified in the Class Action Allegations; and

      (c)    Plaintiffs and Class Members who leased multifamily residential property leases from Landlord Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

110. Plaintiffs and Class Members have been injured and will continue to be injured in their business and property by paying more for multifamily residential property leases leased from Landlord Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

111. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust law or, alternatively, a violation of federal antitrust law under either a quick look or rule of reason analysis.

112. Plaintiffs and Class Members are entitled to an injunction against Defendants,

CLASS ACTION COMPLAINT      29      Cotchett, Pitre & McCarthy LLP
(Case Number)      999 N Northlake Way, Suite 215
Seattle, WA 98103

Case 3:23-cv-00337     Document 1     Filed 12/09/22     Page 32 of 39     PageID 32

preventing and restraining the violations alleged herein.

### SECOND CAUSE OF ACTION
### Against All Defendants
### (Violation Of The Washington Consumer Protection Act,
### RCW Section 19.86.010 et seq.)

113.    Plaintiffs incorporate the allegations in preceding paragraphs as if fully set forth herein in full.

114.    The Washington Consumer Protection Act, RCW 19.86 et seq., provides consumers with a comprehensive procedure for redressing Defendants' unfair or deceptive business practices.

115.    Defendants' acts and omissions as alleged herein violate the Washington CPA because they: (1) are unfair or deceptive acts or practices; (2) are committed in the course of Defendants' business; (3) affects the public interest; and (4) have caused injury to (5) Plaintiffs in their business and/or property and to the members of the Class.

116.    Defendants' above-described conduct of engaging in a conspiracy to artificially raise the rental prices of multifamily residential property leases in the geographic markets identified in the Class Action Allegations to supra-competitive levels constitutes an unfair trade practice, and unfair and/or deceptive acts and practices, within the meaning of the Washington Consumer Protection Act, RCW 19.86 et. seq.

117.    Defendants' above-described conduct affects the public interest because it affected and injured or had the capacity to injure a substantial portion of renters who directly leased from Defendants. The conduct complained of is capable of repetition and will likely affect other consumers.

118.    As a result of Defendants' above-described unfair and deceptive conduct, Plaintiffs and the Class members were injured and/or damaged by the wrongful acts and practices of Defendants.

119.    Defendant's actions illustrate why a permanent injunction is necessary to protect Plaintiffs and the public from similar unfair and unconscionable treatment.

120.    Defendant's actions and inactions as alleged herein are the proximate cause of

injury to Plaintiffs and the Class in an amount to be proven at trial.

121. The balance of the equities favors the entry of permanent injunctive relief against Defendants. The public will be irreparably harmed absent the entry of permanent injunctive relief against Defendants. An injunction against Defendants is in the public interest. Defendants' unlawful behavior is likely to reoccur absent the entry of an injunction.

### THIRD CAUSE OF ACTION
### Against All Defendants
### Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, et seq.)

122. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

123. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Sherman Act and the California Business and Professions Code, §§ 16700, et seq.

(a) During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of multifamily residential property leases at supra-competitive levels.

(b) The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of multifamily residential property leases.

(c) For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of multifamily residential property leases; and (2) Letting certain multifamily residential property units sit empty instead of leasing them.

(d) The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) Price competition in the lease of multifamily residential property has been restrained, suppressed, and/or eliminated in California; (2) Prices for multifamily residential property leases managed sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in California and throughout the United States; and (3) Those who leased multifamily residential property units from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property in that they paid more for multifamily residential property leases than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

### FOURTH CAUSE OF ACTION
#### Against All Defendants
#### Violation of the Florida Deceptive and Unfair Trade Practices Act
#### (Fla. Stat. §§ 501.201 et seq.)

124. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

125. Defendants' acts and omissions as alleged herein violate the Florida Deceptive and Unfair Trade Practices Act as they are (1) deceptive acts or unfair practices that (2) have directly caused (3) actual damages to Plaintiffs and the Class.

126. Defendants' above-described conduct of engaging in a conspiracy to artificially raise the rental prices of multifamily residential property leases in the United States to supra-competitive levels constitutes unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce as prohibited by Fla. Stat. §§ 501.201 et seq.

CLASS ACTION COMPLAINT 32 Cotchett, Pitre & McCarthy LLP
(Case Number) 999 N. Northlake Way, Suite 215
Seattle, WA 98103

Case 3:25-cv-00337    Document 1    Filed 12/09/22    Page 35 of 39    PageID 35

127. Defendants' acts offend public policy as it has and continues to affect and injury or has the capacity to injury a substantial portion of renters who directly leased with from defendants. These acts are capable of repetition and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

128. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in that they paid more for multifamily residential property leases than they otherwise would have in absence of Defendants' unlawful conduct.

129. As a result of Defendants' violations of Fla. Stat. § 501.204, Plaintiffs and members of the Class seek actual damages lost plus reasonable attorneys' fees and court costs, pursuant to Fla. Stat. § 501.211.

## X. PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

1. The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) and direct that reasonable notice of this action be given to each and every member of the Class as provided by Rule 23(c)(2);

2. That the unlawful conduct alleged herein be adjudged and decreed:

    a. An unreasonable restraint of trade or commerce in violation of the Sherman Act and the Cartwright Act;

    b. An unfair or deceptive practice in violation of the Washington CPA and the Florida Deceptive and Unfair Trade Practices Act; and

    c. A violation of the Sherman Act, the Cartwright Act, the Washington CPA, and the Florida Deceptive and Unfair Trade Practices Act.

3. Plaintiffs and the Class Members recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the Class Members be entered against Defendants in an amount to be trebled to the extent such laws permit;

4. Plaintiffs and the Class Members recover damages and other relief, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits

CLASS ACTION COMPLAINT      33      Cotchett, Pitre & McCarthy LLP
(Case Number)      999 N. Northlake Way, Suite 215
Seattle, WA 98103

Case 3:23-cv-00337     Document 1     Filed 12/09/22     Page 36 of 39     PageID #36

unlawfully gained from them;

5. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6. Plaintiffs and the Class Members be awarded restitution, including disgorgement of profits Defendants obtained as a result of its acts of unfair competition and acts of unjust enrichment;

7. Plaintiffs and the Class Members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8. Plaintiffs and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**9.** Plaintiffs and Class Members have such other and further relief as the case may require and the Court may deem just and proper.

## XI. JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.

Dated: December 9, 2022          **COTCHETT, PITRE & McCARTHY, LLP**

By: ___/s/ Karin B. Swope_____

Karin B. Swope (WSBA #24015)
kswope@cpmlegal.com
Galen K. Cheney (WSBA # 56382)
gcheney@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Telephone: (206) 802-1272
Facsimile: (650) 697-0577

CLASS ACTION COMPLAINT                     34                    Cotchett, Pitre & McCarthy LLP
(Case Number)                                                   999 N. Northlake Way, Suite 215
                                                               Seattle, WA 98103

Case 3:25-cv-00337    Document 1    Filed 12/09/22    Page 37 of 39    PageID.37

Adam J. Zapala *(pro hac vice* forthcoming)
azapala@cpmlegal.com
Elizabeth T. Castillo *(pro hac vice* forthcoming)
ecastillo@cpmlegal.com
James G. Dallal *(pro hac vice* forthcoming)
jdallal@cpmlegal.com
Gayatri Raghunandan *(pro hac vice*
forthcoming)
graghunandan@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Daniel E. Gustafson *(pro hac vice forthcoming)*
dgustafson@gustafsongluek.com
Daniel C. Hedlund *(pro hac vice forthcoming)*
dhedlund@gustafsongluek.com
Daniel J. Nordin *(pro hac vice forthcoming)*
dnordin@gustafsongluek.com
Shashi K. Gowda *(pro hac vice forthcoming)*
sgowda@gustafsongluek.com
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Dennis Stewart *(pro hac vice forthcoming)*
dstewart@gustafsongluek.com
**GUSTAFSON GLUEK PLLC**
600 W Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299

Kenneth A. Wexler *(pro hac vice forthcoming)*
kaw@wbe-llp.com
Justin N. Boley *(pro hac vice forthcoming)*
jnb@wbe-llp.com
Melinda J. Morales *(pro hac vice forthcoming)*
mjm@wbe-llp.com
Margaret Shadid *(pro hac vice forthcoming)*
ms@wbe-llp.com
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Ste. 5450
Chicago, IL 60606
Telephone: (312) 346 2222

Kevin S. Landau *(pro hac vice forthcoming)*
klandau@tcllaw.com
Brett Cebulash *(pro hac vice forthcoming)*
bcebulash@tcllaw.com
Gwendolyn Nelson *(pro hac vice forthcoming)*
gnelson@tcllaw.com

CLASS ACTION COMPLAINT
(Case Number)
35
Cotchett, Pitre & McCarthy LLP
999 N Northlake Way, Suite 215
Seattle, WA 98103

Case 3:25-cv-00337    Document 1    Filed 12/09/22    Page 38 of 39 PageID 38

**TAUS, CEBULASH & LANDAU, LLP**
123 William Street, Suite 1900A
New York, New York 10038
Telephone: (212) 931-0704

David M. Cialkowski *(pro hac vice forthcoming)*
david.cialkowski@zimmreed.com
Ian F. McFarland *(pro hac vice forthcoming)*
ian.mcfarland@zimmreed.com
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400

*Attorneys for Plaintiffs John Pham, Diana Lazarte, Marco Cuevas, Valdamitra Anderson, Michael Poole and Daniel Flowers and the Proposed Class*

CLASS ACTION COMPLAINT
(Case Number                    )

36

Cotchett, Pitre & McCarthy LLP
999 N. Northlake Way, Suite 215
Seattle, WA  98103

Case 3:25-cv-00337     Document 1     Filed 12/09/22     Page 39 of 39 PageID #: 39